## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JAMES A. HENSON,                                    *

Plaintiff                                          *

v                                                  *          Civil Action No. JKB-19-0172

FRANK B. BISHOP, JR., *et al*.,                    *

Defendants                                         *
                                                 ***

## MEMORANDUM OPINION

In response to the above-entitled civil rights complaint, defendants Warden Frank B. Bishop Jr., Assistant Warden Jeff Nines, Major Ronald Stotler, Mental Health Counselor Lauren Beitzel, Social Worker Melissa Harr and Chief of Security William S. Bohrer, filed a motion to dismiss or, in the alternative, for summary judgment.  ECF  15.  Plaintiff was advised of his opportunity to oppose the motion (ECF 16) and has filed a response entitled "Plaintiff's Third Affidavit."  ECF 17.  The court finds a hearing in this matter unnecessary.  *See* Local Rule 105.6. For the reasons that follow, defendants' motion, construed as a motion for summary judgment, shall be granted.

### Background

#### A.  Plaintiff's Allegations

In his complaint as supplemented, James Henson, a state inmate confined at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, alleges that he fears for his safety. ECF 1, 5.  In the caption of the complaint, plaintiff names Warden Frank B. Bishop Jr., Assistant Warden Jeff Nines, Correctional Major Ronald Stotler, Mental Health Counselor Lauren Beitzel, Social Worker Melissa Harr and Chief of Security William S. Bohrer as defendants.  ECF 1, p. 1.

The complaint, as supplemented, reiterates plaintiff's familiar claims concerning the entirety of his incarceration[1] and is difficult to decipher as he refers to cases, administrative grievances, and filings dating back to the early 2000s.  Plaintiff also refers to previously filed cases in an effort to support his allegations of regular and continuous problems with prison staff, including his cell assignments and alleged conspiracies against him.  Those allegations, to the extent they have previously been litigated, are barred by *res judicata* and will not be considered.[2]

---

[1]     Plaintiff's claims of a far-reaching conspiracy have been investigated and found unsubstantiated, resulting in the dismissal of the claims both administratively and judicially.  *See e.g. Henson v. Likin*, Civil Action No. RWT-11-2719 (D. Md.); *Henson v. Miller*, Civil Action No. RWT-12-763 (D. Md.); *Henson v. Lambert*, Civil Action No. RWT-12-3271 (D. Md.); *Henson v. Smith, et al.*, Civil Action No. RWT-13-2266 (D.Md.); *Henson v. Bishop*, RDB-14-2131 (D. Md.) (dismissing for failure to exhaust administrative remedies but noting affidavits of all correctional staff that they had not: submitted false incident reports, encouraged the submission of falsified medical reports, or instructed anyone to house plaintiff with violent, dangerous gang members.)  Those claims will not be addressed again.

[2]     Plaintiff has filed numerous cases alleging correctional employees intentionally placed him in cells with dangerous inmates.  He has been unsuccessful in these claims.  Plaintiff previously filed suit regarding an assault as well as allegations concerning Correctional Officers Wilson, Merling, Lark and Weber assigning him to a cell with Inmate Jenkins, an alleged "professed racist."  *See Henson v. Likin*, Civil Action No. RWT-11-2719 (D. Md.).  Defendants were granted summary judgment in that case.

Plaintiff previously filed suit against CO II Jesse Lambert, CO II Nicholas Soltas, CO II Steven Miller, CO II Randolph Bennett, CO II Christopher Ortt, CO II Joshua Tart, and CO II Shawn Murray, alleging they assigned him to cells with gang members and advised gang members on the unit that plaintiff was a rapist.  He reiterated his claim regarding the assault by Jenkins and sought protective custody and a federal investigation.  *See Henson v. Lambert*, Civil Action No. RWT-12-3271.  Defendants were granted summary judgment in that case.

Plaintiff's previously filed suit against Lt. Dale Smith, Case Worker Gainer, Caseworker Sindy, Lt. Miller, Sgt. Iser, Sgt. Guilliam, and Sgt. Tyndale, again alleging overall failure to protect and lack of a policy to address risks to plaintiff's health and safety and an overarching conspiracy, was likewise dismissed.  *See Henson v. Smith*, Civil Action No. RWT-13-2266 (D. Md.).

Plaintiff  also previously sued Warden Frank B. Bishop, Jr., Lt. William E. Miller, Major Robert M. Friend, Lt. Bradley Wilt, Sergeant Walter Iser, CO II Jesse L. Lambert, CO II Christopher Anderson, CO II Nicolas Soltas, and CO II Steven Miller alleging that he was the target of a campaign of murder carried out by correctional staff and specifying an assault on June 20, 2014.  *See Henson v. Bishop*, Civil Action No. RDB-14-2131 (D. Md.).  Defendants were granted summary judgment in that case.

Plaintiff sued Lt. Sawyer and unnamed members of Housing Unit 2, alleging they subjected him to excessive force and placed him in cells with known criminals in order to cause him harm.  Sawyer's motion for summary judgment was granted.  *See Henson v. Sawyer, et al.*, RDB-16-0053 (D. Md.).

Other complaints raising bald conspiracy claims were dismissed *sua sponte* by the Court.  *See Henson v. Wilt, et al.*, Civil Action No. RDB-14-3724 (D. Md.); *Henson v. Friend, et al.*, Civil Action No. RDB-14-3825 (D. Md.), and *Henson v. Miller, et al.*, Civil Action No. RDB-15-28 (D. Md.).

In this complaint, plaintiff states that from September 5, 2005 through 2019, unidentified Maryland officials and correctional staff have retaliated against him for filing grievances.  ECF 1-1, p. 1.

Plaintiff also states that unidentified correctional staff "foment racial hatred" and freely use profanity, threats, pepper spray and chokeholds.  *Id.*  He also contends that unspecified officers damage inmate property, submit false medical documents, fabricate misbehavior reports, manipulate assaults and murders, edit videos, and destroy evidence.  *Id.*

Additionally, plaintiff claims that unidentified medical personnel will not treat his chronic pain regarding a "lacerated-fractured skull, neck, ribs, L-R shoulder, upper-lower back, L-eye flashing white stars, etc." and that medical treatment is difficult to obtain and essentially non-existent. *Id.*

### B.  Defendants' Response

Lauren Beitzel, Mental Health Professional Counselor at NBCI, avers that plaintiff has a history of requesting staff visits but then refusing to attend or participate in the visit once scheduled.  ECF 15-3, p. 1 ¶¶ 1, 3.

Beitzel recalls that plaintiff was scheduled for three mental health appointments with her in 2015 but refused to attend two of them and provided responses, consisting of simple head nods, during the third visit.  *Id.*, p.1 ¶ 3.  Specifically, on September 14, 2015, plaintiff was scheduled to see Beitzel but he refused his pass.  The officer advised Beitzel that plaintiff appeared anxious.

---

Where there has been a final judgment on the merits in a prior suit, an identity of the cause of action in both the earlier and the later suit, and an identity of parties or their privies in the two suits, *res judicata* is established.  *See Pension Ben. Guar. Corp. v. Beverley*, 404 F. 3d 243, 248 (4th Cir. 2005).  The doctrine of *res judicata* precludes the assertion of a claim after a judgment on the merits in a prior suit by parties on the same cause of action.  *See Meekins v. United Transp. Union*, 946 F. 2d 1054, 1057 (4th Cir. 1991).  In addition, "'[n]ot only does *res judicata* bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'"  *Id.* (quoting *Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F. 2d 355, 359 (4th Cir. 1989)).

Beitzel noted that plaintiff had a long history of refusing passes, including calls, letters, and visits from his attorney, which prompted the referral to her. *Id.*, p. 3. She further noted that plaintiff was diagnosed as suffering from "simple paranoid state" in August of 2014 but was not on any prescribed medications and, in light of his refusal of care, she could not assess his current mental or physical state. *Id.* Beitzel consulted with plaintiff on October 2, 2015, after custody referred him due to concerns about him languishing in his cell and refusing visits, phone calls, and letters. *Id.* Plaintiff was placed in the confinement cage in Beitzel's office. He only communicated with her through head nods but agreed to correspond with Beitzel regarding his mental health and his rationale for refusing referrals. His hygiene was good. Beitzel recorded her intention to see him at his cell and send him written questions to establish rapport. *Id.* Beitzel followed up with plaintiff by sending him written questions regarding his mental health and refusal of all passes, to which he provided some responses, but continued to refuse to attend in-person consultations. *Id.*, pp. 4-5. Plaintiff's concerns regarding his safety were relayed by Beitzel to the appropriate staff members. *Id.*, p. 5. In November of 2015, the Treatment Team discussed moving plaintiff to housing unit 2, the special needs unit (SNU), for further assessment. *Id.*, p. 6.

From February through October of 2016, plaintiff was scheduled for ten mental health visits with Beitzel, but he either refused to attend or to cooperate during the visits. *Id.*, p. 1 ¶ 3; *id.*, pp. 6-10. During this time Beitzel noted that while plaintiff was evaluated for SNU he communicated with staff and followed proper hygiene and the goal was to continue that behavior on housing unit 1. *Id.*, p. 6. She planned to continue to see plaintiff at his cell door and communicate with him via writing. *Id.* Plaintiff's mental health remained unclear but his writings revealed persecutory and delusional tones. *Id.*, p. 7. Throughout that time, plaintiff continued to isolate and communicate with staff only in writing, but his hygiene was improved and appropriate.

4

*Id.*, pp. 7-9.  In September of 2016, Beitzel discontinued scheduling plaintiff to be seen monthly given his repeated refusal to cooperate and his apparently stable symptomology.  *Id.*, p. 9.  On October 14, 2016, in response to a call from plaintiff's family member, Betizel checked on plaintiff's well-being.  *Id.*, p. 10.  His cell was clean and well kept.  Plaintiff came to the cell door and communicated via head nods, denying he was suicidal.  *Id.*  Plaintiff refused to meet with Beitzel later that month but appeared to be okay.  *Id.*

In December of 2018, plaintiff refused a scheduled visit.  ECF 15-3, p. 1 ¶ 3; *id.*, p. 10.  Beitzel noted that plaintiff did not have a mental health diagnoses or active psychiatric medication prescriptions at that time.  *Id.*, p. 11.  She further noted that plaintiff was again advised of the self-referral processes and available resources.  *Id.*

On September 17, 2019, Beitzel was scheduled to assess plaintiff's mental health because he requested a refill of psychiatric medications, but the medical records indicated no such medications had been prescribed.  ECF 15-3, pp. 1-2 ¶ 3; *id.*, p. 11.  At the time of the appointment, plaintiff advised the escorting correctional officer that he did not need to see Beitzel but wanted to speak with her about certified mail receipts.  *Id.*  Plaintiff "appropriately identified himself and his cell location" and "was polite and appropriate."  *Id.*  His hygiene was good and he interacted appropriately with the escorting officer; as such no referral was made to the psychiatry department.  *Id.*

Melissa Harr is a social worker at NBCI.  ECF 15-4, p. 1 ¶ 1.  Harr has no recollection of having any face to face interaction with plaintiff.  *Id.*  From 2015 to 2018, Harr was assigned to the Special Needs Unit (SNU) at NBCI, which is a mental health program.  *Id.*  Harr was assigned to interview plaintiff for potential placement in the SNU program.  *Id.*  Plaintiff was placed on the

pass list to be brought to the SNU on November 24, 2015 to be interviewed by Harr but custody staff advised Harr that plaintiff refused to attend the interview.  *Id.*, p. 1 ¶ 3, p. 3.

Harr avers that plaintiff wrote to her and she sent him a written reply on November 24, 2015, indicating that he could be placed on the pass list for an appointment with her but she never heard back from him.  ECF 15-4, p. 2 ¶ 4; *id.*, p. 3.  Other than the foregoing interactions, Harr has no recollection of ever having any other interaction with plaintiff.  *Id.*, p. 2 ¶ 4.

Plaintiff was placed on a pass list to be interviewed on January 13, 2016, but again refused to attend his interview, and was never accepted into the SNU due to his refusal to cooperate with the process.  *Id.*, p. 1 ¶ 3; *id.*, p. 4.  Harr noted that while plaintiff did show improvement while being evaluated for the SNU, he also refused to speak with staff and it was not possible to determine his mental health status.  *Id.*  She noted that plaintiff would be followed by psychology with the possibility of returning to SNU if appropriate.  *Id.*, p. 4.

Beitzel and Harr each aver that they had no involvement with plaintiff's housing assignment, security classification, medical care, work or education programs, or any other aspect of his confinement.  ECF 15-3, p. 2 ¶ 4; ECF 15-4, p. 2 ¶ 5.  Additionally, they each deny retaliating against plaintiff in any way or attempting to cause him harm.  *Id.*

Plaintiff's medical records demonstrate that on December 11, 2018, he underwent an "Intrasystem Transfer Screening" during which he was asked several questions regarding his general health.  ECF 15-9, p. 2.  Plaintiff denied having any medical, dental, or mental health complaints.  *Id.*  No evidence of abuse or trauma was observed.  *Id.*

Plaintiff submitted four sick call slips regarding various ailments during the time at issue in this case.  ECF 15-9, pp. 3-6.  On  at least 15 separate occasions, plaintiff refused medical

attention for sick call requests as well as for scheduled chronic care visits, health assessments, and routine vaccinations. *Id.*, pp. 7-21.

In September of 2019, plaintiff was seen by medical providers; none of his medical appointments indicate he had a prior or current allegation of "lacerated-fractured skull, neck, ribs, L-R shoulder, upper-lower back." ECF 15-9, pp. 22-33. As previously noted, on September 9, 2019, plaintiff requested to be placed back on "psyche meds" but there was no evidence he had a recent prescription for psychiatric medication or that a referral for psychiatric evaluation was appropriate. *Id.*, p. 32.

Warden Bishop and Assistant Warden Jeffery Nines each aver that they expect NBCI staff to comply with NBCI directives and policies regarding inmate housing, inmate safety and security, medical care, and general prison conditions. ECF 15-5 ¶ 3; ECF 15-6 ¶ 3. Additionally, when responding to an inmate's administrative remedy procedure (ARP) complaints, Bishop and Nines rely on the review and investigations by staff to respond to the ARP complaint under their signature. *Id.* ¶ 4. Bishop and Nines each deny retaliating against plaintiff in any way or harming or attempting to harm plaintiff in any manner. *Id.* ¶ 5.

Ronald Stotler, Correctional Officer Major, avers that his duties as a ranking senior correctional official are primarily administrative and he does not have direct daily interactions with inmates. ECF 15-7 ¶ 3. He expects NBCI staff to comply with directives and NBCI policies regarding housing, safety, security, and general prison conditions. *Id.* Stotler relies on staff to assess and recommend inmate rule violations for his signature. *Id.* ¶ 4. Stotler denies retaliating against plaintiff in any way or causing or attempting to cause plaintiff harm. *Id.* ¶ 5.

William S. Bohrer was the Chief of Security at NBCI during the time at issue in the complaint. ECF 15-8 ¶ 1. Bohrer also avers that he expected staff to comply with directives and

polices regarding housing, inmate safety, security, general prison conditions. *Id.* ¶ 3.  Bohrer relied on staff to review and recommend inmate housing assignments for his signature. *Id.* ¶ 4.

None of the named defendants have filed a Notice of Inmate Rule Violation against plaintiff. ECF 15-10, p. 1 ¶¶ 2, 3.

During the three years prior to plaintiff's filing of this case, he filed approximately 152 ARPs. ECF 15-10, pp. 10-20.

### Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and (6), or, in the alternative, as one for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Hous., LLC v. The City of Salisbury*, 672 F. App'x. 220, 222 (4th Cir. 2016) (per curiam).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).  Because defendants filed a motion titled "Motion to Dismiss or, in the

Alternative, Motion for Summary Judgment" along with documents in support, plaintiff was on notice that the Court could treat defendants' motion as one for summary judgment and rule on that basis. *See id.* Accordingly, the Court will review plaintiff's claim under the Rule 56(a) standard.

Summary Judgment is governed by Federal Rule of Civil Procedure 56(a) which states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

**Analysis**

**A.  Statute of Limitations**

To the extent plaintiff alleges that any of the conduct complained of occurred prior to January 9, 2016, such claims are barred by the statute of limitations and will not be considered:

> Title 42 U.S.C. § 1988 endorses the borrowing of state-law limitations provisions where doing so is consistent with federal law; § 1988 does not, however, offer any guidance as to which state provision to borrow. To fill this void, for years we urged courts to select the state statute of limitations "most analogous," *Bd. of Regent of Univ. of N.Y. v. Tomanio*, 446 U.S. 478, 488 (1980), and "most appropriate," *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 462 (1975), to the particular § 1983 action, so long as the chosen limitations period was consistent with federal law and policy. *Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 367 (1977); *Johnson*, *supra* 421 U.S. at 465.

*Owens v. Okure*, 488 U.S. 235, 239 (1989). Section 1983 provides a federal cause of action, but in several respects relevant here, federal law looks to the law of the State in which the cause of action arose. "This is so for the length of the statute of limitations: it is that which the State

10

provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 387 (2007) (citing *Owens*, 488 U.S. at 249-50). In Maryland, the applicable statute of limitations is three years from the date of the occurrence. *See* Md. Code Ann., Cts & Jud. Pro. Code § 5-101.

The question of when a cause of action has accrued under §1983 is a federal question. *See Nassim v. Md. House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc). The date of accrual occurs "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Id.* Under the prison mailbox rule, an action under §1983 is commenced for the purpose of meeting the statute of limitations when the complaint is delivered to prison staff for mailing and is no longer under the plaintiff's dominion and control. *See Houston v. Lack*, 487 U.S. 266, 276 (1988); *Lewis v. Richmond City Police Dept.*, 947 F.2d 733 (4th Cir. 1991).

Plaintiff alleges wrongdoing as early as 2007, but he knew or had reason to know of any possible claim beginning in 2007 and therefore any claim brought for injuries arising before January 9, 2016—three years prior to his filing the instant complaint—is barred by the statute of limitations.

### B. Personal Participation

Other than naming defendants in the caption of his complaint, plaintiff has not alleged how any of the named defendants were responsible for the conduct alleged. Accordingly, plaintiff's complaint is subject to dismissal as to each defendant. Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Moreover, supervisory defendants Warden Bishop, Assistant Warden Nines, Correctional Major Stotler and Chief of Security Bohrer were not personally involved in any of alleged

11

wrongful conduct. Their status as supervisory employees, without more, is not enough to impose liability. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Under § 1983, individual liability must be based on personal conduct. *See Wright v. Collins,* 766 F.2d 841, 850 (4th Cir. 1985). Further, absent subjective knowledge, a prison official is not liable. *Farmer v. Brennan,* 511 U.S. 825, 847 (1994); *see Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998).

Here, nothing in plaintiff's complaint suggests that Warden Bishop, Assistant Warden Nines, Correctional Major Stotler, or Chief of Security Bohrer were personally involved in the conduct alleged. Moreover, the record evidence demonstrates that none of these defendants were personally involved in any of the conduct complained of, entitling them to summary judgment.

## C. Medical Care

To the extent plaintiff claims Beitzel and Harr denied him medical care, they are entitled to summary judgment. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious

medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available.  *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.  *See Farmer*, 511 U.S. at 839-40.  Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'"  *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the

13

general risk, and also that the conduct is inappropriate in light of that risk.").  "Actual knowledge

or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate

indifference 'because prison officials who lacked knowledge of a risk cannot be said to have

inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting

*Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct

evidence of actual knowledge or through circumstantial evidence tending to establish such

knowledge, including evidence "that a prison official knew of a substantial risk from the very fact

that the risk was obvious."  *Scinto*, 841 F.3d at 226 (quoting *Makdessi v. Fields*, 789 F.3d 126, 133

(4th Cir. 2015)).

There is no underlying distinction between the right to medical care for physical ills and

its psychological and psychiatric counterpart:

> [A prisoner] is entitled to psychological or psychiatric treatment if a physician or
> other health care provider, exercising ordinary skill and care at the time of
> observation, concludes with reasonable medical certainty (1) that the prisoner's
> symptoms evidence a serious disease or injury; (2) that such disease or injury is
> curable or may be substantially alleviated; and (3) that the potential for harm to the
> prisoner by reason of delay or the denial of care would be substantial.

*Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *see also DePaola v. Clarke*, 884 F.3d 481,

486 (4th Cir. 2018) ("Courts treat an inmate's mental health claims just as seriously as any physical

health claims.").  The *Bowring* Court further concluded that the aforementioned right to such

treatment is based upon the essential test of medical necessity and not upon that care considered

merely desirable.  *Bowring*, 551 F.2d at 48.

The record evidence demonstrates that plaintiff refused to cooperate with Beitzel and Harr in

having his mental health needs assessed and treated.  He regularly refused to attend consultations, be

evaluated at his cell, or keep up with writing to Beitzel about his mental health status.  Nevertheless, the

record evidence demonstrates that staff continued to assess and evaluate plaintiff's mental status, including

14

a failed effort to have him assigned to the SNU.  Ultimately, plaintiff's refusal to cooperate with staff made it impossible to determine whether his behavior was born out of mental illness or fear.  Plaintiff's demeanor was regularly observed and despite a failure to be able to fully assess him it was determined that his hygiene was appropriate, he was not decompensating, and he continued to communicate with staff.  In light of the foregoing, the Court cannot find that Beitzel or Harr were deliberately indifferent to plaintiff's medical needs and they are entitled to summary judgment.

## Conclusion

For the foregoing reasons, defendants' motion to dismiss or in the alternative for summary judgment IS GRANTED.  A separate Order follows.

Dated this 10th day of July, 2020.

FOR THE COURT:

_____**/s/**_____
James K. Bredar
Chief Judge